# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| CARA SALSBERG, | : | No. 7 EAP 2022 |
| | : | |
| Appellant | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | September 15, 2021, at No. |
| v. | : | 623 EDA 2019 affirming the Order |
| | : | entered on January 17, 2019, in |
| | : | the Court of Common Pleas, |
| DONNA MANN AND DREXEL | : | Philadelphia County, Civil Division |
| UNIVERSITY, | : | at No. 170603584 |
| | : | |
| Appellees | : | ARGUED: March 7, 2023 |

## OPINION

**JUSTICE BROBSON**                    **DECIDED: February 21, 2024**

This discretionary matter concerns a claim brought by Cara Salsberg (Salsberg), a former at-will employee of Drexel University (University), against her former supervisor, Donna Mann (Mann), asserting that Mann intentionally interfered with Salsberg's contractual relationship with Drexel by taking actions that led to and included Salsberg's firing. While recognizing that Pennsylvania law permits claims of intentional interference with the performance of contracts by third parties, the Court of Common Pleas of Philadelphia County (trial court) and our Pennsylvania Superior Court concluded that Mann was nonetheless entitled to summary judgment because governing law further dictates that, in the context of an existing at-will employment relationship, an employee has no contractual or legally enforceable right to continued employment with which a third party can interfere. Upon review, we hold that the lower courts erred in reaching that

conclusion. We further hold, however, that an at-will employee cannot recover on a claim for intentional interference with an existing at-will employment relationship against her supervisor under the circumstances of this case, where Mann was acting within the scope of her employment with Drexel and, thus, was not a third party to the relationship as required to establish the tort in Pennsylvania. Accordingly, we affirm the Superior Court's judgment, albeit on alternative grounds.[1]

## I. BACKGROUND

### A. RELEVANT LAW

To provide better context for the current dispute, we set forth a brief summary of the relevant law. This Court has recognized claims for intentional interference with contractual relations as far back as the 1800s. *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1182 n.12 (Pa. 1978) (explaining that this Court "had long recognized a right of action for interference with existing contractual relations" and citing, *inter alia*, *Vanarsdale v. Laverty*, 69 Pa. 103 (1871), in support), *appeal dismissed*, 442 U.S. 907 (1979). Our Court has done so in an array of factual scenarios, including those which involve: (1) the employment context as well as other unrelated contexts; (2) interference with existing contractual relations and interference with prospective contractual relations; and (3) various third-party entities as defendants.[2] Moreover,

---

[1] "This Court may affirm the order of the court below if the result reached is correct without regard to the grounds relied upon by that court," and we have "discretionary authority to affirm an order of a lower court 'for any valid reason appearing from the record.'" *In re Adoption of C.M.*, 255 A.3d 343, 347 n.1, 363 (Pa. 2021) (quoting *Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (Pa. 2009)).

[2] *See, e.g.*, *Vanarsdale*, 69 Pa. at 109 (affirming judgment against citizens who, without cause, petitioned school board not to employ teacher seeking reappointment for upcoming school term; providing that "[a] groundless petition instigated only by malice cannot surely be the right of any citizen where it actually results in harm to the object of its malicious purpose"); *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 473-75 (Pa. 1960) (concluding that plaintiff stated cause of action against his former employer and its sales (continued…)

throughout the development of the law in this area, the Court has adopted or otherwise relied upon various iterations of the provisions and attendant commentary in the Restatement (Second) of Torts (Restatement) as to such claims, including Section 766 of the Restatement.[3]  More to this point, our Court cited to Section 766 of the Restatement (First) of Torts with approval in two cases[4] before adopting that provision "and its definition

---

manager for intentional interference with contractual relations, where plaintiff alleged that former employer, through sales manager, "falsely and maliciously" induced plaintiff's current employer to fire plaintiff); *Adler*, 393 A.2d at 1177, 1181-86 (reinstating award of injunctive relief in favor of law firm on claim that firm's former associates intentionally interfered with existing contractual relationships between law firm and its clients); *Glenn v. Point Park College*, 272 A.2d 895, 896-98 (Pa. 1971) (recognizing cause of action for intentional interference with prospective contractual relationship in case where real estate brokers brought suit against real estate vendee for vendee's negotiation of direct purchase of real estate from vendor, depriving brokers of anticipated commissions); *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 469-72 (Pa. 1979) (collecting Pennsylvania cases that have examined alleged interferences with both existing contracts and prospective business relations but denying relief on both claims in dispute concerning whether defendants interfered with plaintiffs' leasehold interest in, and ongoing attempts to purchase, property from owners).

[3] *See, e.g., Birl*, 167 A.2d at 474 (adopting prior version of Section 766 of Restatement and relying upon special note to comment m to describe concept of malice); *Adler*, 393 A.2d at 1182 n.13 (observing that "we have repeatedly looked to the Restatement as authority for the elements of a cause of action for intentional interference with existing contract relations"); *Glenn*, 272 A.2d at 897, 899 (explaining that "[t]he courts of this Commonwealth have accepted and applied [Section] 766 in a variety of situations" and citing favorably to "proposed comment D to the Tentative Draft of [Section] 766A of the Restatement" relating to intent); *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 469-70, 479 (Pa. 2011) (holding that "Restatement [Section] 772(a) applies in Pennsylvania to preclude an action for tortious interference with contractual relations where it is undisputed that the defendant's interfering statements were truthful" and explaining that "[t]he Restatement commentary [the Court] set forth [previously] amply explain[ed] why the conveyance of truthful information cannot reasonably be deemed to be 'improper' interference"); *see also Thompson Coal Co.*, 412 A.2d at 470 (noting then-recent trend of separating claims of interference with existing contract rights pursuant to Section 766 of Restatement and interference with prospective contractual relations pursuant to Section 766B of Restatement).

[4] *Bloom v. Devonian Gas & Oil Co.*, 155 A.2d 195, 196 (Pa. 1959); *Bright v. Pittsburgh Musical Soc'y*, 108 A.2d 810, 814 (Pa. 1954).

of the right of action for intentional interference with existing contractual relations" in *Birl v. Philadelphia Electric Company*.  *Adler*, 393 A.2d at 1181-82 & n.12.  We explained in *Birl*:

> At least since *Lumley v. Gye*, (1853) 2 Ell. & Bl. 216, 1 Eng.Rul.Cas. 706, the common law has recognized an action in tort for an intentional, unprivileged interference with contractual relations.  It is generally recognized that one has the right to pursue his business relations or employment free from interference on the part of other persons except where such interference is justified or constitutes an exercise of an absolute right:  Restatement, Torts, Section 766. . . .
>
> . . . .
>
> The elements of this tort of inducing breach of contract or refusal to deal, which must be averred in the complaint, are set forth in the Restatement, Torts, Section 766, which says, . . . [']one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby'.  In other words, the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.  Furthermore, where the defendant is alleged to have induced another to discharge his employee by false statements, the substance of such statements should be set out in the complaint.  *Moran v. Dunphy*, [59 N.E. 125 (Mass. 1901)].

*Birl*, 167 A.2d at 474.

Almost two decades later, in recognition of the American Law Institutes' "continuing effort to provide the judicial system orderly and accurate restatements of the common law," and given that the "Court constantly seeks to harmonize common law rules, principles, and doctrines with modern perceptions of societal needs and responsibilities," the Court in *Adler* chose to examine the case before it in light of the most current version of Section 766 available at the time.  *Adler*, 393 A.2d at 1183.  This version, then contained in Tentative Draft Number 23 of Section 766 of the Restatement, is virtually the same as the version currently set forth in the Restatement, which provides:

Intentional Interference with Performance of Contract by Third Person

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Section 766 of the Restatement.[5]

Notwithstanding the above, there is a dearth of case law from this Court explicitly addressing the precise scenario here—*i.e.*, where an at-will employee claims that a supervisor intentionally interfered with the at-will employment relationship between the employee and employer—or the question of whether our common law recognizes such claims pursuant to Section 766 of the Restatement or otherwise. It appears that the only case from this Court that touches upon this discrete question is *Menefee v. Columbia Broadcasting System, Inc.*, 329 A.2d 216 (Pa. 1974), where this Court summarily concluded that certain higher-level employees who had exercised an employer's contract right to terminate an employee on thirteen weeks' notice could not be found liable for conspiracy to interfere with an employee's contractual relationship with the employer because they had a "privilege" to advise the employer on handling its employees and cause the termination of the employee. *Menefee*, 329 A.2d at 217, 221.

---

[5] By way of further background, prior to *Adler*, our Court had elaborated on the elements of the tort as concerns both existing contracts and prospective contractual relations by requiring: (1) "the existence of a contract or of a prospective contractual relation[ship] between the third person and the plaintiff;" (2) an act for "the purpose or intent to harm plaintiff" by inducing a breach of contract or refusal to deal, or preventing a prospective relationship from occurring; "(3) the absence of privilege or justification on the part of the actor . . . and (4) the occurrence of actual harm or damage to plaintiff as a result of the actor's conduct." *Glenn*, 895 A.2d at 898. Of further note, *Adler* highlighted the then-"new" Restatement's shift to "focus[ing] upon whether conduct is 'proper,' rather than 'privileged,' and used the factors set forth in Section 767 of the Restatement to determine whether conduct is "improper" for purposes of the tort. *Adler*, 393 A.2d at 1184 & n.17.

In contrast, the Superior Court has addressed this scenario on multiple occasions. Most relevant here, in *Curran v. Children's Service Center*, 578 A.2d 8 (Pa. Super. 1990), *appeal denied*, 585 A.2d 468 (Pa. 1991), the Superior Court considered whether a psychologist who worked for an organization as an at-will employee could assert against the clinical director who terminated him a claim for intentionally interfering with his contractual relationship with the organization. *Curran*, 578 A.2d at 9. In answering the question, the Superior Court observed that "[a] cause of action for intentional interference with a contractual relationship may be sustained even though the employment relationship is at-will." *Id.* at 13. Notably, in support, the *Curran* Court cited to *Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Division*, 422 A.2d 611 (Pa. Super. 1980) (*abrogation on other grounds* as *recognized in Yetter v. Ward Trucking Corp.*, 585 A.2d 1022 (Pa. Super. 1991)), which in turn relied on Comment g of Section 766 of the Restatement[6] for the proposition that "an action for intentional interference with the performance of a contract lies even though the contract interfered with is terminable at

---

[6] Comment g to Section 766 of the Restatement provides:

> *g. Contracts terminable at will.* A similar situation exists with a contract that, by its terms or otherwise, permits the third person to terminate the agreement at will. Until he has so terminated it, the contract is valid and subsisting, and the defendant may not improperly interfere with it. The fact that the contract is terminable at will, however, is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach. (See § 774A).
>
> One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations. (See § 766B). If the defendant was a competitor regarding the business involved in the contract, his interference with the contract may be not improper. (See § 768, especially Comment *i*).

the will of the parties." *Yaindl*, 422 A.2d at 618 n.6.[7] The Superior Court in *Curran* nonetheless concluded that the psychologist was unable to state a cognizable claim for intentional interference "on account of the termination of his employment." *Curran*, 578 A.2d at 13. The Superior Court explained that, because "a corporation can act only through its agents" and the psychologist identified the clinical director who terminated his employment as an agent of organization-employer in the complaint, there was "no third party against whom an action for intentional interference with a contractual relationship [could] lie." *Id.* As a result, the Superior Court affirmed the trial court's order granting summary judgment in favor of the clinical director and organization.

Following *Curran*, the Superior Court decided *Hennessy v. Santiago*, 708 A.2d 1269 (Pa. Super. 1998), and *Haun v. Community Health Systems, Inc.*, 14 A.3d 120 (Pa. Super. 2011), both of which restricted the application of Section 766 of the Restatement to prospective at-will contracts, seemingly in the face of the Superior Court's prior decision in *Curran*. In *Hennessy*, a doctor employed at-will a habilitative counselor to counsel clients at the doctor's individual practice and at a corporation that the doctor controlled in part and which provided community living arrangements for county residents pursuant to county contracts. *Hennessy*, 708 A.2d at 1272. The doctor fired the counselor after the counselor, upon receiving a report of a rape that occurred at the community living facility, investigated the report and aided the victim in reporting the rape to authorities. *Id.* Claiming that an assistant county administrator, who oversaw the county's activities, instructed the doctor to terminate the counselor in retaliation for helping the rape victim, the counselor brought a claim against the assistant county administrator for tortious

---

[7] *Yaindl*, which involved claims for wrongful discharge and intentional interference with a prospective employment relationship, made the above observation in connection with its point that it was "most useful . . . to view an action for wrongful discharge . . . as a particularized instance of a more inclusive tort of intentional interference with the performance of a contract." *Yaindl*, 422 A.2d at 618.

interference with the counselor's employment relationship. *Id.* In considering whether the counselor could bring such a claim against the county administrator, the Superior Court ultimately held that "an action for intentional interference with performance of a contract in the employment context applies only to interference with a prospective employment relationship whether at-will or not, not a presently existing at-will employment relationship." *Id.* at 1279. While the counselor relied upon the above-quoted language from *Yaindl* relating to at-will contracts in support of her position that an action lies against a third party for intentional interference with an at-will employment relationship, the Superior Court concluded that the language in *Yaindl* was dicta and that the counselor had cited no other cases "where [the] doctrine [relating to intentional interference with contracts terminable at-will] has been extended to the ambit of at-will employment." *Id.* at 1278. As a result, the Superior Court affirmed the trial court's order granting the county administrator's preliminary objection in the nature of a demurrer as to the counselor's intentional-interference claim. *Id.* at 1272, 1279.

In *Haun*, a chief financial officer (CFO) filed a medical malpractice action against a hospital—where he worked as an at-will employee—and others in connection with injuries that his son sustained following the son's birth at the hospital. *Haun*, 14 A.3d at 121-22. Shortly thereafter, an executive for the hospital's parent company and related subsidiary companies (Companies) instructed the chief executive officer (CEO) of the hospital to consider terminating the CFO. *Id.* at 122. Subsequently, the hospital's CEO and human resources director advised the CFO that he was being terminated given that he had become an adversary and the attendant risk involved. *Id.* The CFO then filed suit against the hospital and Companies, alleging, *inter alia*, that the Companies tortiously interfered with the CFO's employment contract. *Id.* In a divided opinion, a majority of the Superior Court observed that it was constrained by *Hennessy* to conclude that the CFO

could not successfully assert a cause of action for intentional interference with a contractual relationship in the foregoing context because his employment relationship was at-will and not prospective. *Id.* at 125. In a footnote, the majority recognized that *Hennessy* remained the prevailing law on the matter unless and until an en banc decision of the Superior Court or decision of this Court overturned it. *Id.* at 125 n.1. The majority added that, insofar as the CFO relied upon language from *Yaindl* and *Curran* to support his contrary position, such language was "merely dicta and, therefore, th[ose] two prior decisions ha[d] no bearing" on the case before it or *Hennessy*'s precedential value. *Id.* Based on the foregoing, the majority reversed the trial court's order to the extent that it overruled preliminary objections in the form of a demurrer relative to this cause of action. *Id.* at 125.

In a concurring and dissenting opinion in *Haun*, then-Judge, now-Justice Mundy disagreed with the majority's conclusion that *Hennessy* was the prevailing decisional law and that it constrained the Court's decision. In so doing, she explained that her review of the law revealed "that different panels of [the Superior Court] ha[d] made contradictory rulings regarding a plaintiff's ability to bring an action for intentional interference with a contractual relationship in an at-will employment context." *Haun*, 14 A.3d at 126 (Mundy, J., concurring and dissenting). Preliminarily, while she agreed that the language cited from *Yaindl*, recognizing intentional interference claims in the context of contracts terminable at will, was dicta, she concluded that *Curran*'s pronouncement that such claims were cognizable in the at-will employment context was not. *Id.* at 126 (Mundy, J., concurring and dissenting). Then-Judge Mundy reasoned that *Curran*'s "unequivocal[]" proclamation that "[a] cause of action for intentional interference with a contractual relationship may be sustained even though the employment relationship is at-will" was essential to *Curran*'s ruling because the *Curran* panel would never had to have reached

the question of whether the supervisor was an appropriate third-party otherwise. *Id.* (Mundy, J., concurring and dissenting) (quoting *Curran*, 578 A.2d at 13). Then, after conceding that this Court's adoption of Section 766 of the Restatement did not mandate that the *Hennessy* panel follow the precepts of Comment g, then-Judge Mundy nevertheless found it notable that the *Hennessy* panel failed to address Section 766, Comment g, or the *Curran* decision, which referenced Comment g. *Id.* at 127 (Mundy, J., concurring and dissenting). Furthermore, given this Court's adoption of Section 766 and the Superior Court's precedent recognizing Comment g, then-Judge Mundy "believe[d] it was incumbent upon the panel in *Hennessy* to explain its departure from the path established by [this] Court." *Id.* (Mundy, J., concurring and dissenting). Then-Judge Mundy concluded that, "[i]n failing to do so, the *Hennessy* decision not only contradict[ed] a prior panel of th[e Superior] Court, but . . . also commit[ted] the jurisprudential error" of enunciating a new precept of law—a task left for this Court—through its departure from Comment g. *Id.* (Mundy, J., concurring and dissenting). Finding that *Hennessy* was not controlling in light of this Court's precedent regarding Section 766 and the Superior Court's "contradictory precedent citing Comment g," and believing that the Superior Court's decisional law on the issue before it was in conflict, then-Judge Mundy would have affirmed the trial court's order overruling the preliminary objections to the CFO's intentional-interference claim. *Id.* (Mundy, J., concurring and dissenting).

## B. THIS MATTER

Having set forth the relevant legal precedent under which the present controversy arose, we now turn to the underlying facts and procedural history of this case. Salsberg worked as an at-will employee for Drexel under Mann's supervision from October 2011 until June 2017, when she was fired for unsatisfactory job performance based on Mann's recommendation and representations. Pertinently, Salsberg began her

employment with Drexel as a senior tax accountant in the Office of Tax Compliance (Tax Office). Salsberg received consistently positive annual performance reviews from Mann through 2016. In the interim, in March 2015, Salsberg was promoted to manager of tax/compliance. Then, beginning sometime in late 2016 or early 2017, the relationship between Salsberg and Mann began to deteriorate. The parties dispute the reasons for this decline in their relationship and the circumstances of Salsberg's termination. Generally, according to Salsberg, Mann started exhibiting erratic workplace behavior and imposing increased work demands on Salsberg, which prompted Salsberg to meet with Mann's supervisor, David Rusenko (Rusenko), about these concerns. Salsberg further claims that, in response, Mann manufactured performance issues—specifically placing Salsberg on a "performance improvement plan" (PIP)—and then used the performance issues as a pretext for effectuating Salsberg's firing in retaliation for Salsberg's meeting with Rusenko and based upon Mann's personal animus toward Salsberg. In retort, Mann attributes the relationship's breakdown and Salsberg's firing to a legitimate decline in Salsberg's work product and attitude in response to increased job demands.

Following her termination, Salsberg filed suit against Mann and Drexel, asserting, *inter alia*, a claim against Mann for intentional interference with Salsberg's contractual relationship with Drexel. After a period of discovery, Mann and Drexel filed a motion for summary judgment seeking dismissal of all claims, which Salsberg opposed. In the context of these filings and subsequent litigation on the motion, the parties disputed the following pertinent issues relative to Salsberg's claim against Mann: (1) whether a contractual relationship existed between Salsberg and Drexel with which Mann could interfere, given the at-will nature of Salsberg's employment with Drexel; (2) whether Mann, as Salsberg's supervisor and Drexel's agent, was a third party to the contract (assuming one existed) and otherwise engaged in privileged and/or justified conduct;

and (3) whether Pennsylvania law only recognizes a claim for intentional interference with a prospective at-will employment relationship and not a presently existing at-will employment relationship.

Ultimately, the trial court issued an order granting the motion for summary judgment and dismissing Salsberg's complaint with prejudice. Salsberg then appealed to the Superior Court. In its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the trial court explained that it granted summary judgment as a matter of law pursuant to the Superior Court's decisions in *Hennessy* and *Haun*. In doing so, however, the trial court noted that Comment g to Section 766 of the Restatement plainly "acknowledges a right to initiate a cause of action by an at-will employee such as []Salsberg," further citing *Adler* and *Curran*. (Trial Ct. 1925(a) Op., 3/20/2019, at 5.) The trial court added that it was persuaded by the minority opinion authored by then-Judge Mundy in *Haun*. (*Id.*) Nonetheless, the trial court recognized that it was not the "forum to create new law or new interpretations" and, thus, granted summary judgment in favor of Mann accordingly.[8] (*Id.* at 5-6.)

Upon review, the Superior Court affirmed in a divided, published, en banc opinion. *Salsberg v. Mann*, 262 A.3d 1267 (Pa. Super. 2021) (en banc). Before the Superior Court, Salsberg argued that the trial court erred in granting summary judgment relative to her intentional interference claim because Pennsylvania law permits intentional interference claims in the context of contracts terminable at will, and Section 766 of the Restatement and federal case law permit such claims in the context of at-will employment contracts. Writing for the majority, President Judge Panella observed that *Hennessy* was the

---

[8] Notwithstanding its conclusion above, the trial court also commented on the issue of whether Mann's conduct was privileged and justified, noting that "such a determination is typically a question of fact for a jury" and that "the record reveal[ed] many genuine issues of disputed facts and circumstances." (Trial Ct. 1925(a) Op., 3/20/2019, at 6.)

prevailing decisional law in holding that an intentional interference claim is cognizable in Pennsylvania in the employment context relative only to a "prospective employment relationship whether at-will or not, not a presently existing at-will employment relationship." *Id.* at 1271 (quoting *Hennessy*, 708 A.2d at 1279). The majority pointed out that the *Hennessy* panel held, albeit "[w]ithout much explanation," that the difference between prospective and existing at-will employment relationships was "critical." *Id.* Noting that "Pennsylvania law distinguishes between claims for intentional interference with prospective contractual relationships and existing contractual relationships," the majority observed that, unlike in the case of existing contractual relationships, prospective contractual relationships afford "something less than a contractual right, [but] something more than a mere hope" and that "a claim for interference with a prospective contractual relationship requires merely a showing of the probability of a future contractual relationship." *Id.* (quoting *Thompson Coal Co.*, 412 A.2d at 471).

The majority explained that, here, "there was nothing prospective about Salsberg's employment relationship with Drexel" but that, instead, "Salsberg had an existing at-will employment contract, limited by implied terms." *Id.* In this regard, the majority opined: "In Pennsylvania, absent a statutory or contractual provision to the contrary, either party may terminate an employment relationship for any or no reason." *Id.* (quoting *Mikhail v. Pa. Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013)). As such, "Salsberg did not have any reasonable expectation of continued employment guaranteed by contract." *Id.* Rather, "any expectation of continued at-will employment is nothing more than a mere hope." *Id.* The majority explained that, "[w]hile Pennsylvania law provides a remedy for interference with expectations that are 'something less than a contractual right,' it does not provide a remedy where those expectations are a 'mere hope.'" *Id.* at 1272 (quoting *Thompson Coal*, 412 A.2d at 471). The majority added that,

in declining to recognize a "common law cause of action against an employer for termination of an at-will employment relationship" except in the "most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy," this Court clearly "wishe[d] to limit the impact of tort law on at-will employment." *Id.* at 1271-72 (quoting *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000), and *Weaver v. Harpster*, 975 A.2d 555, 562-63 (Pa. 2009)). Thus, while recognizing the "tension in *Hennessy*'s explicit reasoning" differentiating between existing at-will employment contracts and prospective ones, and though characterizing Salsberg's arguments as an implicit request to overturn *Hennessy*, the majority declined to do so, opining that the decision was consistent with this Court's precedent. *Id.* at 1272. The majority, therefore, affirmed the trial court's order dismissing Salsberg's complaint with prejudice.

Judge Stabile authored a dissenting opinion, which Judges Dubow and King joined. Therein, Judge Stabile concluded that "Pennsylvania law recognizes an action for intentional interference with an at-will employment contract and that a genuine issue of material fact exists as to that cause of action in this matter." *Id.* at 1272 (Stabile, J., dissenting). In reaching this conclusion, Judge Stabile first opined that this Court adopted Section 766 of the Restatement in its entirety in *Adler* and that Section 766 "expressly and unambiguously applies to contracts terminable at[ ]will" by virtue of Comment g. *Id.* (Stabile, J., dissenting). Next, Judge Stabile agreed with then-Judge Mundy's minority opinion in *Haun* that the *Haun* majority opinion and *Hennessy* were in tension with *Curran*, holding that a cause of action for intentional interference with a contractual relationship may be brought in the context of an at-will employment relationship under Section 766 of the Restatement. *Id.* at 1273 (Stabile, J., dissenting). Suggesting that the en banc panel should revisit *Haun* and *Hennessy* given the inconsistency, Judge Stabile further opined

that both decisions contravened Section 766 as adopted by this Court, Comment g, and the weight of authority from the United States Supreme Court and many other jurisdictions. *Id.* at 1273-74 (Stabile, J., dissenting) (relying upon, *inter alia*, *Truax v. Raich*, 239 U.S. 33, 38 (1915) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at[]will.") (collecting cases)). Positing that *Haun* and *Hennessy* declined to follow Section 766 and adopted the minority approach "without explanation," Judge Stabile added that the decisions "were erroneous, as at-will employment clearly is contractual. That is, the employee continues to work and is entitled to be compensated for work performed until termination of the employment." *Id.* at 1274-75 (Stabile, J., dissenting). Judge Stabile further opined that "[u]nder [Section] 766, the at-will employee is to be free of third-party interference with his or her employment." *Id.* at 1275 (Stabile, J., dissenting) (quoting upon Frank J. Cavico, *Tortious Interference With Contract in the At-Will Employment Context*, 79 U. Det. Mercy L. Rev. 503, 511 (2002) ("[T]he gravamen of the tort is interference with the employment contract irrespective of the term of that contract. The Restatement . . . also maintains that a contract terminable at will is nonetheless a valid and subsisting contract for purposes of an interference with contract tort cause of action; and thus one cannot improperly interfere with it.") (footnote and internal quotation marks omitted)).

Judge Stabile observed that the majority was misguided not only in adhering to *Haun* and *Hennessy* but also in relying upon *Weaver* and *McLaughlin* "for the proposition that [this] Court 'wishes to limit the impact of tort law on at-will employment.'" *Id.* (Stabile, J., dissenting) (quoting *Salsberg*, 262 A.3d at 1272). Noting that *Weaver* and *McLaughlin*

pertained to wrongful discharge claims arising against a former employer, Judge Stabile explained that, by contrast, claims of intentional interference with contractual relations arise against a third party—either a stranger to the employment relationship or another employee acting outside the scope of his employment—who purportedly interfered with the plaintiff's at-will employment. *Id.* at 1275-76 (Stabile, J., dissenting). Judge Stabile opined that *McLaughlin* and *Weaver* "concern[ed] the significant limitations on the ability of at-will employees to sue their former employers for wrongful termination" and that "[t]hose concerns do not apply here." *Id.* at 1275 (Stabile, J., dissenting). Accordingly, because he believed that Section 766 of the Restatement "protects [Salsberg's] existing employment relationship (as opposed to a prospective relationships [*sic*], as per *Haun* and *Hennessy*) from third-party interference," Judge Stabile would have overruled *Hennessy* and *Haun*, reversed the trial court's order granting summary judgment, and remanded the case for further proceedings. *Id.* at 1276 (Stabile, J., dissenting) (emphasis omitted).

## II. ISSUE

We granted discretionary review to resolve the following issue, as stated by Salsberg: "Whether Pennsylvania should apply [Section 766 of the Restatement] to an [i]ntentional [i]nterference claim by an employee at will against a supervisor who acted against that employee, not as an agent on behalf of her employer, but ultra vires and pursuant to personal animus?" *Salsberg v. Mann*, 275 A.3d 964 (Pa. 2022) (per curiam). This issue comes to this Court by way of an order granting summary judgment and implicates a question of law. Accordingly, "our standard of review is *de novo*, and our scope of review is plenary." *Gallagher v. GEICO Indem. Co.*, 201 A.3d 131, 137 (Pa. 2019); *Khalil v. Williams*, 278 A.3d 859, 871 (Pa. 2022).

## III. PARTIES' ARGUMENTS

Before this Court, Salsberg reiterates that the trial court erred in granting summary judgment in favor of Mann on the basis that a claim for intentional interference with contractual relations will not lie for a third party's interference with an existing at-will employment relationship. In support, Salsberg relies upon *Yaindl*, Section 766 of the Restatement, Comment g, and federal authority to argue that the at-will nature of her employment relationship does not defeat her claim. Salsberg also echoes then-Judge Mundy's observations in *Haun* and notes that federal courts have predicted that this Court would recognize a claim for intentional interference with an at-will employment relationship. Salsberg additionally claims that case law makes clear that Mann, as Salsberg's supervisor, can be held liable for intentional interference with contractual relations as a third party to the employment relationship by engaging in conduct that is intentional, improper, without privilege, and outside the scope of her authority. (Salsberg's Br. at 12 (quoting *Yaindl*, 422 A.2d at 619 n.8 (observing that "[i]t is widely held that an agent is liable if he intentionally and improperly induces his principal to break its contract with a third person")).) Salsberg submits that, as demonstrated by the record, this case involves several disputed material facts relative to Mann's actions in that regard, which a jury should resolve. Further highlighting the trial court's receptiveness to her position, Salsberg requests that we recognize her claim against Mann under Section 766 of the Restatement, reverse the decisions below, and remand the matter for further proceedings.

Mann counters that the trial court did not err in granting summary judgment in her favor. Mann argues that, as an at-will employee, Salsberg did not possess the contractual relationship needed to establish an intentional interference claim. Mann submits that our courts "have long framed at-will employment as the inverse of a contractual relationship"

and argues that recognizing intentional interference claims in this context would "contravene the long-settled law of this Commonwealth that employees do not have contractual rights in [the] at-will employment" realm. (Mann's Br. at 11-12 (emphasis omitted).) Further observing the precept that "discharges will not be reviewed in a judicial forum" except in rare instances, Mann contends that permitting a claim of intentional interference in the at-will employment context risks opening the floodgates of litigation, thereby forcing Pennsylvania courts to sit as a "super-personnel board" to review any workplace conflict. (*Id.* at 13-14 (quoting *Scott v. Extracorporeal, Inc.*, 545 A.2d 334, 336 (Pa. Super. 1988)).) Mann adds that recognizing such claims will "erode the long-standing principles of at-will employment" and that "[a]ny further erosion of the at-will presumption in Pennsylvania should be effected by the legislature, not the courts." (*Id.*) Mann also disputes any suggestion by Salsberg that this Court has adopted Comment g to Section 766 of the Restatement and argues that we are under no obligation to adopt Comment g here. Based on the foregoing, Mann "urges this Court to reject Comment g[] and adopt the reasoning of the *Hennessy* and *Haun* majorities." (*Id.* at 13.)

Assuming, *arguendo*, that this Court allows claims of intentional interference with contractual relations in the context of existing at-will employment relationships as a matter of law, Mann submits that Salsberg's claim fails nonetheless because Mann at all times acted properly within the scope of her authority as an agent of Drexel as demonstrated by the record. As such, Mann submits, her conduct was privileged and/or justified, and there was no third-party interference with the employment relationship, as Mann and the University were one and the same. In support, Mann argues that, in Pennsylvania, a corporation's supervisory personnel have "a privilege to cause their corporate employer to terminate an employee." (Mann's Br. at 15 (relying upon *Menefee*, 329 A.2d at 221).) Mann submits that "[t]he overwhelming weight of authority in Pennsylvania is that a . . .

management level agent is not personally liable for inducing breach of contract unless the individual's *sole motive* in causing the corporation to breach a contract is *actual malice* directed toward the plaintiff, or the individual's conduct is against the interest of the corporation. (*Id.* at 16 (emphasis in original) (citing, *inter alia*, *Geary v. U.S. Steel Corp.*, 319 A.2d 174 (Pa. 1974)).) Arguing that there is no record evidence from which a jury could infer that Mann acted solely with actual malice or against Drexel's interest when documenting Salsberg's performance, Mann faults Salsberg for failing to cite to the record or otherwise misrepresenting the record in support of her claim. Mann further notes that mere suspicion of improper or malicious conduct is insufficient to establish that an agent acts outside the scope of her authority and submits that her conduct was proper as demonstrated by application of the six-factor test established for making such determinations.[9] Further relying upon cases that denied intentional interference claims for want of a third party,[10] Mann asks this Court to affirm the Superior Court's decision.

## IV. ANALYSIS

We begin our analysis by clarifying whether our common law recognizes claims for intentional interference with existing at-will employment relationships as a general matter. In doing so, we again set forth the relevant provisions of Section 766 of the Restatement, which, as noted, we have relied upon previously in addressing claims for intentional interference with contracts by third parties:

---

[9] *See Adler*, 393 A.2d at 1184 (relying upon Section 767 of Restatement for following factors to consider in determining whether conduct is "improper:" "(a) The nature of the actor's conduct, (b) The actor's motive, (c) The interests of the other with which the actor's conduct interferes, (d) The interests sought to be advanced by the actor, (e) The proximity or remoteness of the actor's conduct to the interference and (f) The relations between the parties").

[10] *Maier v. Maretti*, 671 A.2d 701, 707 (Pa. Super. 1995), *appeal denied*, 694 A.2d 622 (Pa. 1997*); Nix v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, 596 A.2d 1132, 1137 (Pa. Super. 1991); *Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1002 (Pa. Super.), *appeal denied*, 535 A.2d 1056-57 (Pa. 1987).

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

It is true that, by its plain language, Section 766 does not limit the type of contract that falls within its ambit and, accordingly, would appear to encompass claims of intentional interference with existing at-will employment contracts. Moreover, as illustrated above, Comment g certainly lends further credence to the conclusion that Section 766 comprises such claims. Nonetheless, insofar as these observations are akin to an exercise in statutory construction, while notable, they do not provide a sufficient basis in and of themselves upon which to conclude that claims for intentional interference with at-will employment contracts are to be recognized in Pennsylvania. This Court has explained that adoption of Restatement

> principles into our common law is distinct in concept and application from the adoption of a statute by the General Assembly. Although the reporter's words have intrinsic significance because their purpose is to explain the legal principle clearly, they are not entitled to the fidelity due a legislative body's expression of policy, whose judgment and intent, wise or unwise, a court generally is obligated to effectuate, absent constitutional infirmity. The language of a restatement, as a result, is not necessarily susceptible to "statutory"-type construction or parsing. An effective and valuable restatement of the law offers instead a pithy articulation of a principle of law which, in many cases, including novel or difficult ones, represents a starting template for members of the judiciary, whose duty is then to employ an educated, candid, and common-sense approach to ensure dispensation of justice to the citizenry. The common law relies in individual cases upon clear iterations of the facts and skillful advocacy, and evolves in principle by analogy, distinction, and reasoned explication. This is the essence of justice at common law.

*Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399-400 (Pa. 2014) (citation omitted); *see also Brunier v. Stanert*, 85 A.2d 130, 134 (Pa. 1951) (observing that "[t]his Court has never held that Comment c. of [Section] 44 of the Restatement of Trusts was accepted *in toto* as the law in Pennsylvania" and that to accept "comment as a correct enunciation of the law in Pennsylvania would necessitate judicial assumption of the legislative

prerogative" and require Court "to overrule, at least by necessary implication, the well[-]established principle that oral trusts are viewed with disfavor"). We have made similar observations in addressing claims of intentional interference with contractual relations. *See Walnut St. Assocs., Inc.*, 20 A.3d at 478-79 ("Of course, the fact that the Second Restatement contains [a] refinement [relative to claims for intentional interference with contractual relations by virtue of Section 722 of the Restatement and its commentary, relating to truthful information and honest advice], and explicitly provides that the conveyance of truthful information is not 'improper' interference, is not reason alone for this Court to 'adopt' the provision, or to deem it a proper statement of Pennsylvania law. We adopt the provision, instead, because we believe the formation is consistent with the very nature of the tort, and with Pennsylvania law.").

We, nonetheless, conclude that recognition of a claim for intentional interference with an existing at-will employment contract or relationship against a third party to the relationship not only is consistent with—and a logical application or extension of—"the very nature of the tort . . . and . . . Pennsylvania law," but also "serves the interests of justice." *Walnut St. Assocs., Inc.*, 20 A.3d at 479; *Tincher*, 104 A.3d at 355. Our Court has already recognized an individual's "right to pursue his business relations *or employment* free from interference on the part of other persons except where such interference is justified or constitutes an exercise of an absolute right." *Birl*, 167 A.2d at 474 (emphasis added). At-will employment—though generally characterized by the ability of the parties to the employment relationship to terminate the relationship at any time and for any reason or no reason[11]—is employment nonetheless. Moreover, while we acknowledge that at-will employment does not confer a contractual "right" to continued employment *as between the parties to the employment relationship*, it does not follow that

---

[11] *See infra* at pages 30-31.

an employee has no protectable interest whatsoever in the continuance of that employment relationship vis-à-vis *third parties*:

> The fact that the employment is at the will of the parties . . . does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will.

*Truax*, 239 U.S. at 38. Furthermore, insofar as this Court has looked to the approach of other jurisdictions in determining whether to apply common law rules,[12] the weight of authority indeed appears to be aligned with our decision to recognize such claims based on similar reasoning.[13]

---

[12] *See, e.g.*, *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005) (explaining that Court was persuaded by decisions of sister jurisdictions to formally adopt restatement provision as applied by those jurisdictions in particular scenario); *Tincher*, 103 A.3d at 355 & n.7 (providing that "a court should consider whether the application [of a general common law principle as set forth in restatement provision] is logical and serves the interests of justice, and whether the general principle has been accepted elsewhere"). *But see id.* at 355 n.7 (providing that "questions remain subject to dispute regarding the 'essential nature of the modern Restatements' and whether uniformity among jurisdictions is necessary and wise").

[13] *See, e.g.*, *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 284-85 (Ind. 1991) (noting that Indiana courts had "held that contracts involving at[-]will employment relationships cannot form the basis of a claim for interference with a contractual relationship" on grounds that at-will employment contracts are unenforceable as to terms that remain executory, but observing that "reasoning has been rejected by the vast majority of states" and further recognizing such claims); *Mendelson v. Blatz Brewing Co.*, 101 N.W.2d 805, 807 (Wis. 1960) (providing that "Wisconsin has aligned itself with the majority in holding that a cause of action is maintainable for unlawful interference with an employment contract terminable at will"); *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1041-42 (Ariz. 1985) (relying upon, *inter alia*, *Truax* and Comment g to Restatement to recognize cause of action for intentional interference with "any contract, at-will or otherwise," including at-will employment contract), *superseded in part by statute on other grounds as stated in Galati v. Am. W. Airlines, Inc.*, 69 P.3d 1011, 1013 (Ariz. Ct. App. 2003); *RTL Dist., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct. App. 1996) (explaining that "[t]he existence of an at-will contract of employment . . . does not insulate a defendant from liability for tortious interferences" and that "[u]ntil a contract is terminated, it remains valid and subsisting, and third persons may not improperly (continued…)

In view of the above, we find the Superior Court's decisions in *Hennessy*, *Haun*, and the instant matter to be in error in categorically barring intentional interference claims relative to existing at-will employment relationships. As noted, the Superior Court's rationale was premised on a distinction it delineated between "prospective" and "existing" at-will employment contracts, observing that intentional interference claims were permitted in the former scenario on the grounds that there is a "probability of a future contractual relationship" (which is a protectable interest) but denying such claims in the latter scenario because there is only a "mere hope" that the employment relationship will continue (which is not a protectable interest). *See Salsberg*, 262 at 1270-72. This distinction ignores the expectation interest a party to the at-will employment relationship has in continued employment absent unlawful interference by a third party, identified above. It also fails to recognize the parallel between this "expectancy" interest in future relations and the "expectancy" interest implicated in the context of prospective contractual relations[14]—*i.e.*, that there is a "reasonable likelihood or probability" that the prospective contractual relationship would have come to fruition but for the third party's intentional

---

interfere with it"); *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991) (concluding that "a tortious interference claim will lie for an at-will employment agreement" and that "[t]he at-will employment subsists at the will of the employer and employee, not at the will of a third[-]party meddler who wrongfully interferes with the contractual relations of others"); *Lewis v. Oregon Beauty Supply Co.*, 733 P.2d 430, 433 (Or. 1987) (noting that parties in at-will employment relationship have same interest in integrity and security of their contract as parties to any other contract and that until party to at-will contract terminates same, it is valid and third party is prohibited from improperly interfering therewith); *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994) (observing that "intentional interference with at-will employment by a third party, without privilege or justification, is actionable").

[14] "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations. (See [Section 766B of the Restatement].)" Section 766 of the Restatement, Comment g.

interference—which our Court has already deemed to be protected in this Commonwealth. *Glenn*, 272 A.2d at 898-99; *Thompson Coal*, 412 A.2d at 471. Indeed, in *Glenn*, this Court saw "no reason whatever why an intentional interference with a prospective business relationship which results in economic loss is not as actionable as where the relation[ship] is presently existing." *Glenn*, 272 A.2d at 897. Similarly, where our common law permits claims for intentional interference with existing contractual relations and prospective contractual relations, we find no compelling reason to bar *in toto* a cause of action that is, in essence, a permutation of those two claims.

Accordingly, insofar as we have never before explicitly recognized a claim for intentional interference with an existing at-will employment relationship by a third party, we do so today.[15] This conclusion, however, does not end our inquiry, as "[c]ourts around the country are not in complete agreement over how such an action should be pleaded and proved" when the tort involves an employer's officer, agent, or employee as the purported third party interfering with the employment relationship. *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 404 n.1 (S.D. 2008). Nonetheless, it is beyond cavil that any claim for intentional interference with a contractual relationship by a third party requires, *inter alia*, the existence of an identifiable third-party actor who is interfering with the relationship between two other parties. To illustrate, in *Glazer v. Chandler*, 200 A.2d 416 (Pa. 1964), this Court addressed a situation in which the plaintiff sued the defendant in tort for inducing breach of contract and refusing to deal with third parties. *Glazer*, 200 A.2d at 417. However, the plaintiff's "allegations and evidence only disclose[d] that [the] defendant breached his contracts with [the] plaintiff and that as an

---

[15] We note our agreement with Mann that this Court has never formally adopted Comment g to Section 766 of the Restatement. Nor do we see a compelling reason to adopt Comment g or elaborate on any particular standards or elements relative to the instant claim asserted beyond what is necessary to—and prescribed by—our analysis herein.

incidental consequence thereof [the] plaintiff's business relationships with third parties ha[d] been affected." *Id.* at 418. This Court explained that, under these circumstances, "an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action." *Id.* In support, the Court recognized that all successful claims for the tort, whether involving existing or prospective contractual relationships, require the relationships to "exist[] between third parties and a plaintiff." *Id.* (footnote omitted). The Court continued:

> To permit a promisee to sue his promissor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well[-]settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. The methods of proof and the damages recoverable in actions for breach of contract are well established and need not be embellished by new procedures or new concepts which might tend to confuse both the bar and litigants.

*Id.* (citations omitted).

Stated another way, *Glazer* makes clear that a party cannot "interfere with its own contract." *Gruhlke*, 756 N.W.2d at 410 (quoting *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003)). Moreover, while satisfaction of the "third party" element is left unquestioned in many scenarios—*e.g.*, those that involve a true stranger to the contractual relationship—it cannot be in the present context, where the plaintiff has brought a claim against a coworker. It is

> generally accepted . . . that a corporation can only act through its officers, agents, and employees. *See Weatherly Area Sch. Dist. v. Whitewater Challengers, Inc.,* . . . 616 A.2d 620, 621 ([Pa.] 1992) (noting that governmental agencies, political subdivisions, and private corporations can act only "through real people—its agents, servants or employees."); *Maier*[, 671 A.2d at 707] (concluding employees, agents, and officers of a corporation may not be regarded as separate parties when acting in their official capacity). Indeed, under the doctrine of vicarious liability, the corporation, not the employee, is liable for acts committed by the employee in the course of employment. *See Travelers Cas. & Sur. Co. v. Castegnaro,* . . . 772 A.2d 456, 460 ([Pa.] 2001) (concluding a principal is

liable for the negligent acts and torts of its agents, as long as those acts occurred within the agent's scope of employment).

*Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1196 (Pa. 2012); *see also BouSamra v. Excela Health*, 210 A.3d 967, 984 n.13 (Pa. 2019) (quoting *Petrina v. Allied Glove Corp.*, 46 A.3d 795, 799 (Pa. Super. 2012) ("A corporation is a creature of legal fiction which can act or speak only through its officers, directors, or other agents. Where a representative for a corporation acts within the scope of his or her employment or agency, the representative and the corporation are one and the same entity, and the acts performed are binding on the corporate principal.")). As noted, the Superior Court has already recognized the import of these pronouncements in circumstances similar to those here. *Curran*, 578 A.2d at 13 (explaining that "corporation can act only through its agents" and that, because clinical director who terminated employee was agent of organization-employer, there was "no third party against whom an action for intentional interference with a contractual relationship [could] lie"); *Maier*, 671 A.2d at 707 (rejecting employee's intentional interference claim against supervisor because supervisor was "same party" as employer where supervisor's actions fell within scope of employment; explaining that "[e]ssential to recovery on the theory of tortious interference with contract is the existence of three parties" and that "a corporation acts only through its agents and officers, and such agents or officers cannot be regarded as third parties when they are acting in their official capacity"); *Martin v. Cap. Cities Media, Inc.*, 511 A.2d 830, 845 (Pa. Super. 1986) ("Even if we consider the employee's at-will status as a broad type of contract which could be interfered with, we hold that this allegation is improper in light of the fact that the claim is made by an employee against the publisher of the newspaper

where she worked.  There was no *third*[-]*party* interference with appellant's contract."
(emphasis in original)), *appeal denied*, 523 A.2d 1132 (Pa. 1987).[16]

Thus, it is clear that a plaintiff cannot sue a coworker for the tort of intentional
interference with contractual relations between the plaintiff and her employer unless the
alleged misconduct of the coworker falls outside of the scope of the coworker's
employment or authority.  Finally, while not heretofore mentioned by this Court in relation
to intentional interference claims, we have analyzed "the common law 'scope of
employment' inquiry . . . using the factors set forth [in Section 228 of] the Restatement
(Second) of Agency").  *McGuire ex rel. Neidig v. City of Pittsburgh*, 285 A.3d 887, 892
(Pa. 2022).  Pursuant thereto:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

---

[16] The Superior Court has also rejected claims in this context for both want of a third party
and, in line with our decision in *Menefee*, the existence of a privilege.  *Rimbach*, 519 A.2d
at 1002-03 (concluding that where "a plaintiff has entered into a contract with a
corporation, and that contract is terminated by a corporate agent who has acted within
the scope of his or her authority, the corporation and its agent are considered one so that
there is no third party against whom a claim for contractual interference will lie" and that,
because the employer "had an absolute contractual right to terminate [the] contract and
[the defendant], acting within the scope of his authority as its corporate officer, was
privileged to exercise that right," plaintiff's discharge by defendant on behalf of corporation
did not give rise to claim for intentional interference); *Nix*, 596 A.2d at 1137 (rejecting
claim because defendants were administrative officers acting on behalf of university when
employee was discharged and, thus, were not third parties; further concluding that alleged
interference was privileged because "[c]orporate officers, as well as managerial
employees, by virtue of the responsibilities of their offices, are permitted to take action
which would have the effect of interfering with a contractual relationship between the
corporation and employee")*; Rutherfoord*, 612 A.2d at 508 (holding that no third party
existed for purposes of intentional interference claim because defendants were acting as
agents for hospital and further rejecting claim that defendant can be liable for intentional
and improper inducement even though defendant is not a separate entity on grounds that
defendants were privileged to cause corporate employer to terminate employee).  Given
our focus on the "third party" element of the tort and our ultimate conclusion discussed
below that Salsberg's claim fails for lack of a third party, we need not proceed to address
the nature of the third party's conduct as "privileged," "justified," or otherwise "improper."

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

We likewise find it appropriate to conduct the "scope of employment" analysis through use of these factors.

In sum, we reiterate that a third party can be liable for intentional interference with an at-will employment relationship between an employee and employer in Pennsylvania. In the case of an employee asserting the tort against a coworker, the coworker cannot be held liable unless, at a minimum, the coworker is acting outside the scope of her employment pursuant to Section 228 of the Restatement (Second) of Agency such that she qualifies as a true third party, or stranger, to the contractual relationship. This conclusion is in accord with our common law and the law of other jurisdictions,[17] and it

---

[17] *See, e.g., Gruhlke*, 756 N.W.2d at 408 (holding that "when corporate officers act within the scope of employment, even if those actions are only partially motivated to serve their employer's interests, the officers are not third parties to a contract between the corporate employer and another in compliance with the requirements for the tort of intentional interference with contractual relations"); *Latch*, 107 S.W.3d at 545 ("The acts of a corporate agent on behalf of his or her principal are ordinarily deemed to be the corporation's acts. To show that an agent has interfered with his or her principal's contract, the plaintiff must prove the agent acted solely in furtherance of [his or her] personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract." (internal citations and quotation marks omitted) (alteration in original)); *McGanty v. Staudenraus*, 901 P.2d 841, 846-47, 849 (Or. 1995) (holding that employee acting within scope of employment is not third party to contract between employer and another for purpose of tort of intentional interference with economic relations and utilizing similar "scope of employment" test); *Reed v. Michigan Metro Girl Scout Council*, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993) ("To maintain a cause of action for tortious interference, the plaintiffs must establish that the defendant was a 'third party' to the contract or business relationship. . . . It is now settled law that corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation.").

serves the interests of justice. In this vein, we find the observations made by the Supreme Court of South Dakota, which has employed a similar analysis to that which we adopt today relative to the "scope of employment" inquiry in the context of this specific tort, to be particularly apt as concerns Pennsylvania jurisprudence as well:

> In the employment context, we think a claim of tortious interference with contractual relations may be made against a corporate officer, director, supervisor, or co-worker, who acts wholly outside the scope of employment, and who acts through improper means or for an improper purpose. Such individuals should not stand immune from their independently improper acts committed entirely for personal ends. There are two reasons, however, why judicial vigilance is called for here. First, the tort should not be tolerated as a device to bypass South Dakota's at-will employment law. "An employment having no specified term may be terminated at the will of either party on notice to the other, unless otherwise provided by statute." If we fail to hold the line on these types of tort actions, we put at stake converting at-will employment law into a rule requiring just cause for every employee termination. . . .
>
> . . . Second, use of the tort without adequate controls could chill the advantages of corporate formation. As the Minnesota Supreme Court wrote:
>
>> If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort. To allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation.
>
> *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505-06 (Minn. 1991). Indeed, a rule allowing suits against corporate officers who act within the scope of their authority would be a "dangerous doctrine." Moreover, the distinction between contract and tort would be blurred by the untrammeled imposition of tort liability on contracting parties.

*Gruhlke*, 756 N.W.2d at 405 (some internal citations omitted).

This Court has likewise already cautioned against "erod[ing]" the distinction between tort-based and contract-based theories of recovery in the context of claims for intentional interference with contractual relations. *Glazer*, 200 A.2d at 418. We similarly

acknowledge the concern that allowing the tort recognized here today risks eviscerating our at-will employment principles and stifling employers' ability to structure and conduct their businesses as they choose. Our Commonwealth operates not only under a "strong presumption [that] all non-contractual employment relations [are] at[ ]will" but also pursuant to the well-settled rule that the parties to the at-will employment relationship may terminate the relationship at any time, for any reason or no reason, except in "the most limited of circumstances." *Weaver*, 975 A.2d at 562-63; *McLaughlin*, 750 A.2d at 286-87; *Rothrock v. Rothrock Motor Sales, Inc.*, 883 A.2d 511, 512 n.1, 516 (Pa. 2005) (further explaining that "Pennsylvania has been consistently reluctant to erode th[e] convention" that, "absent an employment contract, an employer is free to terminate an employee at any time, for any reason," and "continu[ing] to hold to Pennsylvania's traditional view that exceptions to at-will termination should be few and carefully sculpted so as to not erode an employer's inherent right to operate its business as it chooses"). These circumstances include instances in which the discharge of an at-will employee would violate a constitutional, contractual, or statutory provision, or would otherwise contravene "a clear mandate of public policy." *Weaver*, 975 A.2d at 556; *McLaughlin*, 750 A.2d at 287; *Socko v. Mid-Atlantic Sys., of CPA, Inc.*, 126 A.3d 1266, 1273 (Pa. 2015). Nonetheless, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Clay v. Advanced Comp. Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989); *see also Geary*, 319 A.2d at 184-85 (holding that where there is "a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge").

These pronouncements exemplify the limited impact tort law has in the at-will employment arena in Pennsylvania, as the Superior Court correctly noted below in the

instant matter. Moreover, while our wrongful discharge cases "concern the significant limitations on the ability of at-will employees to sue their former employers for wrongful termination," our discussion herein lays bare our respectful disagreement with the notion that "[t]hose concerns do not apply here." *Salsberg*, 262 A.3d at 1275 (Stabile, J., dissenting). Rather, such concerns are directly implicated insofar as we recognize that allowing the tort in this context breeds potential for parties to use it to "maneuver . . . around at-will employment law." *Gruhlke*, 756 N.W.2d at 405. We, therefore, agree that courts must remain vigilant against such a practice when addressing claims of intentional interference with contractual relationships by third parties in the at-will employment context.

Having set forth the above standards, we now turn to the circumstances of this case. In doing so, we are mindful that the trial court decided this matter on a motion for summary judgment filed by Mann and Drexel. It is well settled that summary judgment should be awarded "only in cases where the record contains no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Williams*, 278 A.3d at 871. "As we are reviewing the Superior Court's order affirming the grant of summary judgment, we view the record in the light most favorable" to Salsberg as the non-moving party. *Bourgeois v. Snow Time, Inc.,* 242 A.3d 637, 639 n.1 (Pa. 2020). Upon review, we conclude that the trial court did not err in granting the motion for summary judgment in favor of Mann on Salsberg's claim for intentional interference with contractual relations, albeit on different grounds. Specifically, we hold that Salsberg has failed to establish that there exists a genuine issue of material fact that Mann acted outside the scope of her employment such that Mann qualifies as a third party to the employment relationship between Salsberg and Drexel.

Preliminarily, it is undisputed that Drexel employed Salsberg as an at-will employee in its Tax Department under the supervision of Mann at all times relevant herein. Moreover, the record reveals that Mann's supervisory duties encompassed the authority to set/approve Salsberg's schedule and work assignments, evaluate and address Salsberg's job performance, and make recommendations about Salsberg's employment, including recommendations on hiring, promoting, and firing Salsberg.[18] Mann reviewed Salsberg's performance annually through 2016, providing Salsberg

---

[18] (*See* Original Record (O.R.), Item No. 24, Motion for Summary Judgment, Exhibit B, "Performance Improvement Process" Policy (outlining PIP procedures and identifying actions supervisor may take when employee's "performance, attendance, or behavior is unsatisfactory," including termination upon consultation and approval with HR, and preserving at-will nature of employment relationship); Exhibit F (letter dated September 26, 2011, from HR offering Salsberg position of senior tax accountant "[u]pon the recommendation of . . . Mann," providing that Salsberg "will work under the direction of . . . Mann," and explaining that Salsberg's "supervisor will inform [Salsberg] of the expectations regarding [Salsberg's] daily schedule"); Exhibit H (letter dated March 19, 2015, from HR congratulating Salsberg on "position as Manager, Tax Compliance within the Office of Tax Compliance," directing that Salsberg "will work under the direction of . . . Mann," and providing that Salsberg's "supervisor will inform [Salsberg] of the expectations regarding [Salsberg's] daily schedule"); Exhibit I, "Hours of Work" Policy (defining "Drexel's Business Hours" as "8am to 5pm," allowing "Flexible Work Arrangements" with "approval of the immediate supervisor and Department Head," and explaining that "[i]t is the immediate supervisor's responsibility to ensure coverage during Drexel Business Hours so all Professional Staff Members of the work group are aware of each other['s] work schedules"); Exhibit L (PIP issued by Mann to Salsberg on March 22, 2017, identifying performance issues); Exhibit O (email dated May 29, 2017, from Mann to HR Representative regarding May 26, 2017 meeting between Mann and Salsberg on PIP progress and setting forth continued performance issues); Exhibit P, "Termination of Employment" Policy (providing guidelines for termination of employment but preserving at-will status of professional staff members); Exhibit Q (letter dated June 2, 2017, from HR providing that, "as discussed today with . . . Mann, . . . [Salsberg was] being terminated from [her] position . . . . based on [Salsberg's] unsatisfactory performance;" further explaining that, "[i]n conversations with [Salsberg's] supervisor, [Mann] has observed deficiencies and the lack of demonstrated improvement to meet expectations within [Salsberg's] position"); (*See also* Salsberg's Deposition at 54-56, 77-78, 121-22, 211-12, 216 (acknowledging that Mann approved Salsberg's schedule and set work assignments, made recommendations about Salsberg's employment, including promotion and discharge, and reviewed Salsberg's work).)

consistently positive reviews each year. (O.R., Item No. 27, Exhibit 2, Mann's Deposition, at 29-30, 55.) In March 2015, Salsberg was promoted to Manager of Tax Compliance upon Mann's recommendation. (O.R., Item No. 24, Motion for Summary Judgment, Exhibit H.) During Salsberg's tenure as Tax Manager, Drexel's Tax Office consisted of four people: Mann, Salsberg, Hillary Stein (Stein), and Kate Rosenberger (Rosenberger). (Salsberg's Deposition at 24-27, 128.) Mann supervised Stein (in addition to Salsberg), while Salsberg supervised Rosenberger. (*Id.*)

As for the circumstances precipitating Salsberg's termination, Salsberg's own account reveals as follows. Mann and Salsberg had a good working relationship up until March 10, 2017. (Salsberg's Deposition at 113-14, 125.) On that date, Salsberg, Mann, and Stein had a meeting to discuss workload, the need to work overtime, and the need to cover for Rosenberger while Rosenberger was out during the tax "busy season." (*Id.* at 24-25, 28, 33-34.) Though Mann expressed the need for Salsberg and Stein to work overtime, Mann did not indicate how many hours were necessary when Salsberg asked. (*Id.* at 33, 124.) Indeed, Salsberg did not "think it was necessary to work overtime" and felt that she was able to get her work done during her normal hours."[19] (*Id.* at 42, 114, 123.) Salsberg expressed these thoughts to Mann at the March 10, 2017 meeting, though Salsberg did not say that she would or would not work the overtime because she did not know what was expected. (*Id.* at 114, 163-64.) Stein also did not believe overtime was necessary and apparently indicated that at the March 10, 2017 meeting as well. (*Id.* at 121.) In response, Mann explained that Rusenko, Mann's supervisor, indicated that the University was going through changes, that "everything . . . was coming from [Rusenko]," and that Mann "would have to speak to [Rusenko] and [Mann] would get back to" Salsberg

---

[19] Pertinently, while Drexel's regular work hours were 8:00 a.m. to 5:00 p.m., Salsberg was working from 7:00 a.m. to 3:00 p.m. at the time leading up to her separation based on a request to—and approval by—Mann. (Salsberg's Deposition at 30-32.)

and Stein. (*Id.* at 114, 116, 124.) According to Salsberg, it seemed like Mann was using Rusenko as her reason for requiring the extra work. (*Id.* at 163.) Moreover, the meeting on March 10, 2017, was "contentious" and Mann "was definitely upset." (*Id.* at 123.)

Based on the foregoing, on March 13, 2017, Salsberg took it upon herself to meet with Rusenko directly. (*Id.* at 24-25.) Salsberg did not consider her meeting with Rusenko to be an official action pursuant to any policy; rather, Salsberg went to Rusenko hoping to help herself and Mann. (*Id.* at 139, 164-65.) In this regard, Salsberg sought the meeting for two specific reasons: (1) to obtain clarity as to the issues discussed at the March 10, 2017 meeting, particularly as to how much overtime would be required to work; and (2) to discuss certain concerning behaviors that Salsberg had observed Mann exhibiting in the office. (*Id.* at 33-35, 44, 48-50, 56-57, 116, 124, 151.) With respect to the overtime issue, Salsberg and Rusenko discussed certain alternative solutions to address the overtime demands and Salsberg's schedule given her family responsibilities outside of work. (*Id.* at 49, 148.) Salsberg also indicated that she "worked hard during [her] time at the office" and "basically took a stab at the fact that [Mann] did nothing all day" based on Salsberg's belief that Mann "spent more time doing personal stuff than she did work." (*Id.* at 115, 123.) As for Mann's concerning behavior, Salsberg told Rusenko that "[Mann] was crazy"—*e.g.*, "[Mann] would pick her head until it bled," "physically r[u]n through the office," "bump into walls and stuff," and slam her door. (*Id.* at 49-50.) Salsberg and Rusenko speculated as to whether this behavior stemmed from concussions Mann had previously suffered, and Rusenko indicated that he would "work behind the scenes with HR to get [Mann] help." (*Id.* at 143.) Ultimately, however, Rusenko did not provide additional clarity on the amount of overtime that would be required of Salsberg and said that Salsberg should discuss her concerns with Mann. (*Id.* at 35, 147-49.) While Salsberg asked Rusenko to accompany Salsberg in addressing

Mann, Rusenko declined because "he wanted [Salsberg] to deal with it on [her] own" and did not "want [Salsberg] to make matters worse." (*Id.* at 148-49.) Salsberg also expressed to Rusenko that she was afraid that Mann would retaliate against Salsberg for meeting with him directly, because Salsberg knew the meeting would "make Mann mad." (*Id.* at 57-58.) While Salsberg was "scared to death to have that meeting with [Rusenko], . . . [Salsberg] felt . . . that someone needed to know what was going on in that office" relative to Mann's behavior, and Salsberg wanted Mann to get "help." (*Id.* at 138-39.) In response, Rusenko told Salsberg not to worry because Drexel took retaliation very seriously. (*Id.* at 65.)

After meeting with Rusenko, and in accordance with his recommendations, Salsberg approached Mann. (*Id.* at 35, 170.) Mann, however, indicated that she would not speak to Salsberg without the presence of HR. (*Id.* at 51, 170.) Indeed, Mann "[p]retty much" did not speak with Salsberg in the absence of HR from the March 10, 2017 meeting until Salsberg was terminated on June 2, 2017. (*Id.* at 51-54, 120.) Mann did, however, meet with Salsberg and an HR representative two or three times, including for purposes of issuing Salsberg a PIP on March 22, 2017, and discharging Salsberg. (*Id.* at 51-54, 120, 170-71, 179.) With respect to the PIP in particular, Salsberg stated that the PIP was the first time Mann indicated that she was dissatisfied with Salsberg's work product. (*Id.* at 178-79.) Salsberg refused to sign the PIP because she did not agree with it. (*Id.* at 171-72.) As for the termination meeting, Salsberg explained that Mann and an HR representative handed Salsberg a letter and said she was being terminated for performance issues. (*Id.* at 179-81.) Salsberg does not know who made the decision to discharge her. (*Id.* at 181.)

According to Salsberg, her fear that Mann would retaliate against her for meeting with Rusenko was borne out. (*Id.* at 59.) In furtherance of her position that Mann began

treating her differently after that meeting, Salsberg explained that Mann purposefully excluded Salsberg from a learning opportunity at work, refused to approve time off for doctor's appointments for Salsberg, and required Salsberg to cover for everyone in the office. (*Id.* at 59-60, 140-43.) Salsberg also accused Mann of lying to Rusenko about Salsberg screaming in the March 10, 2017 meeting. (*Id.* at 162.) Salsberg additionally elaborated on her disagreement with Mann's statements in the PIP. Specifically, Mann indicated in the PIP, *inter alia*, that Salsberg: (1) exhibited a "lack of behavior expected" in the role of manager, including presenting herself "as a positive influence to all colleagues and show[ing] respect for [her] supervisor;" (2) needed to "improve the quality of [her] work as [her] final work product should have minimal/no errors, especially at the level of the manager role;" (3) needed to "contribute to the increased volume of work and additional responsibilities the Tax Office is required to take on by working extra hours to assist [Mann] in getting the tasks completed;" and (4) at the March 10, 2017 meeting, was "disrespectful towards [Mann] and . . . Rusenko" and "refused to help out where [she was] needed." (O.R., Item No. 24, Exhibit L, PIP issued 3/22/2017, at 1.) In contrast, Salsberg thought that she was a good manager, and she worked the overtime requested of her. (Salsberg's Deposition at 172.) Salsberg also stated that the work she was producing had only minimal errors while adding that Mann was more critical of Salsberg's work after the PIP,[20] but that Salsberg improved while on the PIP and tried her hardest because she loved her job and was a good employee. (*Id.* at 173-74.) Salsberg also emphasized that, at the March 10, 2017 meeting, Salsberg only stated that overtime was unnecessary, not that she refused to work overtime. (*Id.* at 175.) Salsberg added that she worked extra

---

[20] Mann provided Salsberg with "review notes" as to the tax returns Salsberg completed both before and after Mann placed Salsberg on the PIP. (Salsberg's Deposition at 53-56, 174.) Through these review notes, Mann would identify errors and "areas that [Mann] thought [Salsberg] needed to make a change or improve." (*Id.* at 56.)

hours but felt that Mann did not utilize her during that time, that she "did the best [she] could" to work more hours, and that Mann even thanked her for the overtime she put in during one "check in" she had with Mann and HR after the "busy season" but still said it was not enough. (*Id.* at 44-47, 149-50, 177.) Given that Mann had never indicated that Salsberg was not putting in enough overtime up until that point, Salsberg believed that Mann "set up" Salsberg so that she did not work enough. (*Id.* at 177.) Salsberg also indicated that her experience was not an isolated incident, as Mann also had "issues" with Stein, others left the office because of Mann, and Mann engaged in certain documentation practices designed to "get rid" of others. (*Id.* at 119, 188-93.)

Upon review of the circumstances of Salsberg's termination in the light most favorable to Salsberg, we conclude that there is no genuine issue of material fact as to whether Mann acted outside the scope of her authority such that Mann can be considered a third party that is liable for intentionally interfering with Salsberg's at-will employment relationship with Drexel.[21] As an initial matter, there is no dispute that Mann's conduct at all relevant times fell within authorized time and space limits and that this matter does not

---

[21] Justice Mundy expresses a preference for remanding this matter to allow the parties to present more fulsome advocacy as to whether Mann's actions fell within the scope of her employment. In support, Justice Mundy cites to an allegation in Salsberg's Complaint, suggesting the allegation alone creates a genuine issue of material fact notwithstanding the undisputed record evidence discussed above. (Concurring and Dissenting Op. at 2-3 (Mundy, J.) (quoting Complaint, 6/30/2017, ¶ 97 at 10).) In responding to a motion for summary judgment, however, "the nonmoving party cannot rest upon the pleadings, but rather must set forth specific facts demonstrating a genuine issue of material fact." *Bank of Am., N.A. v. Gibson*, 102 A.3d 462, 464 (Pa. Super. 2014), *appeal denied*, 112 A.3d 648 (Pa. 2015). Instead, "a non-moving party must adduce sufficient *evidence* on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1042 (Pa. 1996) (emphasis added), *cert. denied*, 519 U.S. 1008 (1996). A non-movant's "[f]ailure to adduce [such] evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* As explained herein, our review reveals that there is no genuine issue of material fact on the scope-of-employment issue as demonstrated by the evidence of record, even when viewed in the light most favorable to Salsberg.

involve any use of force. *See* Section 228(1)(b), (d) of Restatement (Second) of Agency. Moreover, Mann's conduct was clearly "of the kind [she wa]s employed to perform" in supervising Salsberg (*i.e.*, directing Salsberg's work and schedule, evaluating Salsberg's performance, and making recommendations as to Salsberg's employment at Drexel). *See* Section 228(1)(a) of the Restatement (Second) of Agency. Finally, we conclude that there is no issue of genuine material fact that Mann's actions were "actuated, at least in part, by a purpose to serve" Drexel. Section 228(1)(c) of the Restatement (Agency). While this issue appears to be the most contested by the parties, Salsberg admitted that she openly disagreed with Mann's approach to handling the Tax Office's increased workload and Salsberg's schedule, by-passed Mann by raising the issue at a meeting with Mann's own supervisor even though Salsberg knew the meeting would anger Mann, and stated that Mann had mental health issues during that meeting. Salsberg also does not dispute that Mann was displeased with the amount of hours that Salsberg was working and Salsberg's attitude and performance as a manager, including as it related to admitted errors in Salsberg's work. As noted in *Geary*, decided in the wrongful discharge context but under similar circumstances, an employer has a legitimate interest in "preserv[ing] administrative order in its own house" irrespective of whether the employee's "intentions were good," and an employer can fire an at-will employee to advance that interest subject to limitations not at issue here. *Geary*, 319 A.2d at 178-79.[22] Thus, even accepting that

---

[22] In *Geary*, an at-will employee working for United States Steel Corporation (US Steel) repeatedly voiced concerns about the safety of a new product, eventually "by-passing his immediate superiors" and raising the matter with a vice president in charge of the sale of the product. *Geary*, 319 A.2d at 173, 180. While the product was ultimately reevaluated and withdrawn from the market, Geary was fired. *Id.* at 173-74. This Court rejected Geary's wrongful-discharge claim, holding that where a "complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge." *Id.* at 180. The Court reasoned that "[t]he most natural inference from the chain of events recited in the complaint [wa]s that (continued…)

the additional hours were unnecessary, the expectations were not clear, Salsberg "did her best" with her work, Salsberg met with Rusenko for the benefit of herself and Mann, and Mann acted for personal retaliatory reasons in effectuating Salsberg's firing, there is no genuine dispute that Salsberg was terminated at least in part for a purpose to serve Drexel. *See, e.g., Gruhlke*, 756 N.W.2d at 409-10 (rejecting claim that plaintiff sufficiently alleged that defendant constituted third party by "act[ing] out of his personal interests when he advocated for the termination of [plaintiff's] business relationship with [corporation]" because "corporate officers cannot be considered third parties to contracts between the corporate employer and another if the actions of the officers were even partially motivated to serve employer interests" and plaintiff failed to allege that defendant acted "solely" for personal interest); *see also Reed*, 506 N.W.2d at 232-33 (rejecting claim for intentional interference with economic relations against defendant serving as executive director and chief executive officer of girl scout council for failure to show defendant "was acting strictly for her own personal benefit when she allegedly persuaded the council not to sell [property] to plaintiffs[; a]lthough plaintiffs alleged that [defendant] personally disliked [one plaintiff] and was out to 'punish' him, these allegations stem[med] from a prior real estate transaction in which [that plaintiff] ultimately sued the council[ and, thus, the defendant's] motives therefore [could] not be said to be strictly personal"). Indeed, in light of *Geary*, and in exercising the aforementioned judicial vigilance against attempts to circumvent our at-will employment doctrine, we view this case as such an attempt and reject it accordingly.

---

[the employee] had made a nuisance of himself, and the company discharged him to preserve administrative order in its own house." *Id.* at 178.

## V. CONCLUSION

For the foregoing reasons, we hold that Pennsylvania does not categorically bar

claims for intentional interference with an at-will employment contract or relationship by a

third party.[23]  As such, we hold that the trial court and Superior Court erred to the extent

---

[23] Chief Justice Todd opines that the Court should decline to recognize the above claim of third-party intentional interference in the at-will employment context because, in that context—insofar as Pennsylvania law is concerned—no contract exists with which a third party can interfere.  The at-will employment doctrine as adopted in Pennsylvania provides that, generally, an "employer and employee each have the power to terminate the employment relationship for any or no reason."  *Weaver*, 975 A.2d at 557 n.3.  From this doctrine, however, it does not follow that the at-will aspect of the employment relationship renders the entirety of that relationship non-contractual.  At a bare minimum, even in an at-will employment scenario, an employer offers to pay an employee for work performed, and the employee agrees to perform that work in exchange for that pay.  Indeed, the recognition of at-will employment as contractual is not controversial; as the Chief Justice acknowledges, several jurisdictions recognize that at-will employment is contractual. (Concurring and Dissenting Op. at 3 n.3 (Todd, C.J.).)  We fail to see how Pennsylvania's at-will employment doctrine, which merely provides that the parties to the employment relationship can terminate that relationship for any or no reason, negates the contractual context of the other aspects of the employment relationship.

Relatedly, insofar as Chief Justice Todd disagrees with our decision on the ground that, because there is no contract for continued employment in the at-will employment context, there can be no breach for which a third party can be liable, we disagree that the absence of such a breach precludes recognition of the tort theory we adopt today.  This Court has long recognized that recovery under this tort theory encompasses instances beyond those involving a breach of contract.  *See, e.g.*, *Birl*, 167 A.2d at 474 (explaining that tort "of inducing breach of contract or refusal to deal" applies when third party improperly causes "person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another").  As we explain above, an at-will employee and her employer have an expectation interest in the continuance of the at-will employment relationship absent unlawful interference by a third party.  That the employee or employer can terminate the at-will employment relationship without incurring liability themselves provides no defense for the third party against incurring liability for unlawfully causing the termination of that relationship—because both an employer and employee have an expectation interest that a third party will not so act.

Finally, Chief Justice Todd theorizes that the multifactored standards applicable to, and fact-specific nature of, claims of third-party tortious interference with contractual relations will have a significant and detrimental impact on Pennsylvania law in the at-will employment realm.  Preliminarily, we reiterate that our decision today recognizes a theory of tort recovery against a third party that unlawfully interferes with the at-will employment
(continued…)

that they reached the opposite conclusion, and we overrule the Superior Court's decision in *Hennessy* and its progeny insomuch as they do the same. We further hold, however, that an employee cannot successfully assert this type of claim against a coworker unless the employee demonstrates, *inter alia*, that the coworker acted outside the scope of her authority under the circumstances of the particular case, thereby rendering the coworker a true third party, or stranger, to the at-will employment relationship. Finally, because Salsberg failed to establish a genuine issue of material fact as to whether Mann acted outside the scope of her authority such that Mann could be treated as a third party to Salsberg's at-will employment relationship with Drexel, the courts below did not err in concluding that Mann was entitled to summary judgment on Salsberg's claim. We, therefore, affirm the order of the Superior Court, although we do so on different grounds.

Justices Donohue, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion in which Justice Donohue joins.

Chief Justice Todd files a concurring and dissenting opinion.

Justice Mundy files a concurring and dissenting opinion.

---

relationship between an employer and an employee. Our decision does not, and cannot, expose an employer or an employee to liability as parties to the employment relationship because, as demonstrated herein, neither the employer nor the employee can interfere with their own at-will employment relationship. Moreover, while our decision opens an avenue for recovery by an employee against another employee of the employer in the at-will employment context, such recovery is permitted only when that other employee is, *inter alia*, acting as a third party by engaging in conduct that falls outside the scope of her employment—a concept not unfamiliar to the law or workplace. Respectfully, and for these reasons, we decline to forego recognition of the tort of third-party intentional interference with contractual relations in the at-will employment context based upon the concerns raised by the Chief Justice.